**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Prime Core Technologies Inc., *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 23-11161 (JKS)<br><br>(Jointly Administered) |
| PCT Litigation Trust,<br><br>        Plaintiff,<br><br>  v.<br><br>Pine Grove Consulting, Inc.,<br><br>        Defendant. | <br><br><br> Adv. Proc. No. 25-_____ (JKS) |

## <u>COMPLAINT</u>

The PCT Litigation Trust ("<u>Plaintiff</u>" or "<u>PCT</u>")[2] established in the above-captioned

chapter 11 cases (the "<u>Chapter 11 Cases</u>"), through its undersigned counsel, files this complaint

(the "<u>Complaint</u>") against Defendant Pine Grove Consulting, Inc. ("<u>Pine Grove</u>") (Prime and Pine

Grove are referred to as "<u>Parties</u>"), pursuant to sections 547 and 550 of title 11 of the United States

Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), seeking to avoid and recover all

preferential transfers of property made by the Debtors to or for the benefit of Pine Grove plus

interest, attorneys' fees, and costs. To the extent that Pine Grove filed a proof of claim or has a

claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or has

---

[1]   The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "<u>Debtors</u>" or "<u>Prime</u>"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]   PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

otherwise requested payment from the Debtors or the Debtors' estate (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any of such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section 502"), and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by PCT herein as further stated in Count IV below. PCT alleges as follows:

## **INTRODUCTION**

1.    Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime in June 2023 and Prime filed for bankruptcy shortly thereafter in August 2023. Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them.  But Pine Grove attempted to avoid losses by causing Prime to execute preferential transfers on May 22, 2023 and May 31, 2023 of 120 USDC and $2,520,831.01 (collectively, the "Transfers").  Those Transfers must be returned to PCT.

2.    PCT brings this adversary proceeding (the "Adversary Proceeding") pursuant to sections 547 and 550 of the Bankruptcy Code to avoid and recover all transfers of property and all obligations of Prime to or for the benefit of Pine Grove, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases.[3]  These transfers constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.

---

[3]    Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

3.      Pine Grove is a registered money service business which operates primarily with a stablecoin called Reserve (RSV).

4.      To effectuate its services, Pine Grove engaged Prime primarily to gain access to the U.S. banking system.

5.      The agreements that governed Prime and Pine Grove's relationship during the Preference Period were:  (i) Prime Trust Order Form, effective May 1, 2022 (the "Order Form");[4] (ii) Prime Trust Master Services Agreement, revision date August 30, 2022 (the "MSA");[5] (iii) Services Schedule for Prime Trust Custodial Services, revision date May 13, 2022 (the "Custodial Agreement");[6] and (iv) Service Schedule for Prime Trust API Services, revision date August 1, 2022  (the "API Agreement")[7] (collectively, the "Agreements").

6.      Prime was a Nevada state-chartered trust company and Prime and Pine Grove initially entered into a trust agreement in 2018 (the "2018 Agreement").

7.      However, the Parties superseded the 2018 Agreement in 2022 when they executed the Order Form, which unequivocally states that it "***shall supersede and replace any prior agreement(s) that may be in place***" between Pine Grove and Prime with respect to Prime's services.  Ex. A, Order Form, Terms and Conditions (emphasis added).

8.      The MSA explicitly states that it "***does not create a . . . fiduciary or employment relationship between the parties.***"  Ex. B, MSA, § 14.1 (emphasis added).

9.      The Custodial Agreement provides that Prime was entitled to "***pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such [assets]. . .with***

---

[4]    A copy of the Order Form is attached as Exhibit A.

[5]    A copy of the MSA is attached as Exhibit B.

[6]    A copy of the Custodial Agreement is attached as Exhibit C.

[7]    A copy of the API Agreement is attached as Exhibit D.

*all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]*" <u>Ex. C</u>, Custodial Agreement, §2.7(b) (emphasis added).

10.    The Agreements establish that the Parties maintained a strictly debtor-creditor relationship.  Pine Grove was well aware of what a trust agreement entailed because of the 2018 Agreement, but chose to agree to the terms of the Agreements nonetheless.  This demonstrates Pine Grove did not intend to maintain a trust relationship with Prime.

11.    In March of 2023, Prime received a grand jury subpoena related to an investigation into Pine Grove's relationship with FTX.  Prime terminated Pine Grove's account and the Agreements following an investigation that revealed multiple red flags.  Pine Grove's CEO—Mr. Nevin Freeman—was personally in communication with Prime Trust's CEO—████████— seeking to either re-open Pine Grove's relationship with Prime or to withdraw the funds from Prime's platform.

12.    Prime refused to transfer any funds to Pine Grove until May 2, 2023, when it concluded its investigation into funds Pine Grove transferred to Prime.

13.    The fiat that Pine Gove transferred to Prime was held in commingled "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled the fiat Pine Grove transferred to Prime with fiat from Prime's many other customers and Prime's own fiat generated from its business operations.

14.    Prime attempted to keep track of commingled fiat transferred by Pine Grove (and other customers) with an internal, omnibus ledger (the "<u>Internal Ledger</u>").  But the Internal Ledger was errantly and later intentionally corrupted by Prime.

15.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat that Pine Grove transferred to Prime.

16.     The third-party expert retained by PCT in this matter, James P. Brennan, has confirmed that it is impossible to identify or trace the fiat that Pine Grove transferred to Prime from fiat provided by Prime's other customers or from Prime's own fiat.  *See* Declaration of James P. Brennan (the "Brennan Decl.").[8]

17.     Bank account statements reflect that the fiat transferred from Prime to Pine Grove during the Preference Period was not the original fiat that Pine Grove had transferred to Prime.  *See id*. at ¶¶ 26, 27.  Rather, these transfers consisted of fiat from the commingled, omnibus bank accounts in Prime's name.

18.     The crypto that Pine Grove transferred to Prime was held in commingled "omnibus" digital wallets (the "Omnibus Wallets"), which also held crypto transferred to Prime by other customers and Prime's own crypto.

19.     In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[9] holding more than 11,000 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id.* at ¶ 100.

20.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the

---

[8]     A copy of the Brennan Decl. is attached as Exhibit E.

[9]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f."

transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts.  *See id.* at ¶ 103.

21.    Prime executives admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

Q:    When it says funds transfer. . . and it says "wire, wire, wire."  Do you see that?

A:    Yes.

Q:    ***There were no wire transfers; right***?

A:    ***Yes***.

Q:    ***Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?***

A:    ***Yes, there were no wire transfers***.

Deposition of ████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "████ Dep."), 164:22–165:10 (emphasis added).

22.    Prime's use of its fiat transferred by other customers to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled fiat from Pine Grove and other Prime customers.

23.    Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace any specific deposits, withdrawals, or

transfers that were made by any particular customer, including Pine Grove.  *See* <u>Ex. E</u>, Brennan Decl., ¶¶ 143.

24.     Prime's Transfers to Pine Grove during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's filing of the Chapter 11 Cases  on the Petition Date.

25.     Because the Parties' relationship was strictly a debtor-creditor relationship, the Transfers to Pine Grove during the Preference Period must be returned to the Debtors' estate pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.

26.     During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Pine Grove that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Pine Grove and, accordingly, reserves the right to amend this Complaint.

## **PARTIES**

27.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "<u>Plan</u>"), which the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the

"Effective Date").[10]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id*., § 1.118.

28.    Defendant Pine Grove Consulting, Inc., is Delaware-based corporation with a registered address in Oakland, California.

29.    In the *Second Amended Plan Supplement with Respect to Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket  No. 539] (the "Plan Supplement"), Prime identified preference claims against Pine Grove as "Exempted Preference Claims", and thus, these claims were not released on the Effective Date of the Plan.[11]

## JURISDICTION AND VENUE

30.    The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code. Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor."  *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all

---

[10]    *See* Docket No. 694.

[11]    Prime filed the Plan Supplement under seal.  [*See* Docket No. 539.]  Prime reserves its right to maintain the confidentiality over the remainder the "Exempted Preference Claims" identified in the Plan Supplement.

matters pursued by the PCT Litigation Trust." *Id.*, §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

31.    This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

32.    In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties to this action, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

33.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

34.    This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## **<u>BACKGROUND ON CRYPTOCURRENCY</u>**

35.    The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Bitcoin and Ethereum are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies, including USD Coin ("<u>USDC</u>") and Tether ("<u>USDT</u>").

36.    All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks." Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time. The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

37.    There are many different blockchains. The first and most popular blockchain was the BTC blockchain. Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH. The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

38.    Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

39.    "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

40.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

41.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

42.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

43.     A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:



44.     Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device. To do this, the wallet owner must know

her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to effectuate transactions in the crypto kept on the digital wallet. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

45.    Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto. Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.    Prime's Business Operations

46.    Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

47.    Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

48.    In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

49.    Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

50.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service"—serving as an "on-and-off ramp" and "payment rail" for crypto companies needing traditional money transmission to facilitate its crypto business and operations.

51.     Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain its own MTLs.

52.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

## II.     Pine Grove Engaged Prime for Payment Services, Not Trust or Fiduciary Services

53.     According to its onboarding materials, Pine Grove provides digital assets services through which customers can buy and sell RSV, a stablecoin that Pine Grove uses for all its business. Customers can send Pine Grove RSV in exchange for USD stablecoin.  Pine Grove's revenue comes from the spread on its buy and sell prices.

> The stablecoin we deal in is called Reserve, or RSV. For the rest of this document we will refer to it as RSV.

> Like normal cryptocurrency OTC desks, our revenue comes from the spread on our buy and sell prices. We typically charge 0.1-0.2% for purchases and sales of the stablecoin we deal in.

54.     Pine Grove does not issue RSV and, according to its onboarding materials, "anyone can create or redeem RSV without [their] permission or participation."  However, it does act as a market maker by buying and selling RSV for USD.

> Note: We are not a "stablecoin issuer" in the usual sense, in that we do not offer a coin directly backed by US dollars, nor are we in control of the creation and redemption of RSV. Anyone can create or redeem RSV without our permission or participation, by directly interacting with the smart contracts we have published.
>
> We have created a mobile app that allows users to purchase, send, and sell RSV. The purpose of this app is to make it easy for individuals and businesses to use a USD stablecoin to save and transact.
>
> We currently target customers in the US and Latin America. Our Latin American customers often are from countries that have high inflation, and our platform makes it easier for them to hold and spend in a USD-like asset. Our US customers often are businesses and HNW individuals who have a reason to interact with our other customers in Latin America.
>
> In the app, we act as a market maker, buying and selling RSV for USD. This is the portion of

55.    To enable the provision of these products and services, Pine Grove engaged Prime in July 2021.

56.    According to the Due Diligence questionnaire, when Pine Grove's customers wanted to exchange RSV for USD, Pine Grove would initiate outgoing ACH or wire transfers from Prime.

> In the app, we act as a market maker, buying and selling RSV for USD. This is the portion of our business that involves Prime Trust. For instance, if a customer has an RSV balance and wants to sell for USD, we will make an outgoing ACH or wire transaction from our Prime Trust account to the customer. As of now, we only allow a limited set of customers to send incoming USD transfers to buy RSV from us via our Prime Trust account – typically US companies we have gotten to know personally who are using our app to pay their employees or contractors abroad.

57.    As part of Prime's compliance and onboarding process, Pine Grove was required to provide proof of requisite licensing in a given jurisdiction or a legal opinion which concluded, with sufficient legal analysis, that Pine Grove was exempt from such licensing.

58.    Pine Grove provided Prime with its registration as a money service business with the Financial Crimes Enforcement Network.  At the time, Pine Grove was operating only in U.S. states that did not require an MTL, but was beginning the process of getting MTLs to expand the number of US states that it could serve.

If yes, list and attach a copy of all licenses from each jurisdiction for operation.

Pine Grove is a registered money service business with FinCEN (registration number: 31000162768203). Registration is attached as Exhibit B.

We only operate in US states that do not require MTLs for our business model. We are beginning the process of getting MTLs to expand the number of US states we can serve. We are not currently intending to serve New York customers in the near term and are not currently seeking a BitLicense.

In foreign jurisdictions, we don't perform any exchange of RSV for fiat currencies on our platform. All such transactions are processed by local exchangers that we have partnered with, and these local exchangers are responsible for compliance with their country's relevant regulations.

59.    Throughout the Parties' relationship, Pine Grove utilized Prime for various services, including its "compliance as a service", "payment processing", and "custodial" services.

60.    In March of 2023, Prime's compliance team discovered Pine Grove received a combined total of $722,202,800 from Alameda Research and West Realm Shire Services external account. Both companies are affiliates of FTX, owned by Sam Bankman-Fried.

61.    Prime received a grand jury subpoena concerning these accounts in connection with a money laundering investigation.

62.    Upon receiving the grand jury subpoena, Prime investigated Pine Grove's account activity and discovered multiple red flags which led to Prime terminating its agreements with Pine Grove and transferring the Assets to Pine Grove. Prime terminated its agreement with Pine Grove on March 8, 2023 via letter.

63.    Following this termination, the funds in Pine Grove's account were held by Prime.

64.    Mr. Nevin Freeman—the CEO of Pine Grove—personally was in communication with Prime Trust's CEO ████████ seeking to either re-open Pine Grove's relationship with Prime or withdraw the funds.

On Thu, Mar 23, 2023, 6:27 PM Nevin Freeman <nevin.freeman@reserve.org> wrote:

Hi █████

I can save you some time with a summary, and I've listed the people involved below.

- Background
  ○ We opened our account in 2019 or 2020 and started off doing transactions manually, essentially acting as an OTC desk, buying and selling our stablecoin with wires and ACHs
  ○ Eventually the PT team wanted more insight into the people to whom we were sending and receiving – makes sense!
- API integration
  ○ We negotiated an API-based fee structure which comes out to about $50k/mo at current tx volume
  ○ It took about 8 months to build out the API integration, and it went live progressively over the past couple months
- Compliance concern
  ○ On March 2nd, ████████ and ████████ contacted our team after noticing that many users were apparently signing up with the same email address
  ○ This was because OTC desks that use the Reserve platform were adding KYC profiles for their customers before transacting with them via

65.     On May 2, 2023, Prime sent an email stating the funds were being held "due to an open and active investigation involving the activity of users in the Pine Grove account." It also explained that the funds would be released once Pine Grove provided banking information to Prime.

**From:** Prime Trust
**Sent:** Tuesday, May 2, 2023 12:51 PM
**To:** nevin.freeman@reserve.org
**Subject:** Pine Grove Funds

Mr. Freeman,

The funds with Prime Trust are still being held due to an open and active investigation involving the activity of the users in the Pine Grove account. Additionally, due to the past wire recall the funds remain with Prime Trust to ensure any further wire recalls which may come in are covered.

The funds held in the Pine Grove ACH Reserve account are ready to be released, as all outstanding ACH transactions have surpassed the NACHA dispute timeframes. Once banking information is provided these funds can be returned.

Best,

Compliance

### III.    The Agreements Make Clear that the Parties' Relationship was Strictly a Debtor-Creditor Relationship

66.    The Agreements governed the Parties' relationship during the Preference Period.

67.    At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* <u>Ex. B</u>, MSA, § 13.1 ("The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

68.    Prime and Pine Grove executed the Order Form in May 2022.  *See* <u>Ex. A</u>, Order Form.

69.    The Order Form specifically incorporates the MSA by reference.  *Id*.  ("This Order Form is governed by the Prime Trust Master Services Agreement set forth at: https://www.primetrust.com/legal/msa, the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form (located at: https://www.primetrust.com/legal/msa-service-schedules), and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference.").

70.    The Order Form states that the "[MSA] and any of its incorporated documents, including the Service Schedule(s). . . shall supersede and replace any prior agreement(s) that may be in place between [Pine Grove] and Prime Trust with respect to Prime Trust's services."  <u>Ex. A</u>, Order Form.

71.    The Agreements make clear that the Parties had a strictly debtor-creditor relationship.

72.    The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and Pine Grove.

73.     The MSA explicitly states: "The Parties are independent contractors.   The Agreement does ***not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties***" and that "***nothing in the Agreement, express or implied is intended to give rise to any third-party beneficiary***." Ex. B, MSA, § 14.1 (emphasis added).

74.     Prime, pursuant to the Custodial Agreement, also had complete discretion to invest, rehypothecate, hold and register in its own name, and otherwise transfer or use the assets provided by Pine Grove to Prime as well as retain the profits derived from the assets that Pine Grove transferred to Prime.

75.     For example, the Custodial Agreement permitted Prime to:

> [O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]

Ex. C, Custodial Agreement, § 2.7(b).

76.     The Custodial Agreement also provided that Pine Grove expressly agreed "that any such earnings, income, or compensation shall be retained by Prime Trust, and no portion of any such earning, income, or compensation shall be paid to or for customer . . ." *Id.*.

77.     While the Parties entered into the 2018 Agreement for trust services, this was later replaced and superseded by the MSA. Ex. A., Order Form, Terms and Condition ("The Prime Trust Master Services Agreement. And any of its incorporated documents….shall supersede and replace any prior agreement(s) that may be in place between Customer and Prime Trust with

respect to Prime Trust's services.") As such, the 2018 Agreement did not govern the Parties' relationship during the Preference Period.

78.    Pine Grove was well aware of what was necessary to create a trust relationship given that it had executed the 2018 Agreement with Prime  Pine Grove nevertheless agreed to the above-referenced terms which make clear that the Parties did not maintain a trust relationship, and which superseded and replaced the 2018 Agreement. Thus, it is clear that Pine Grove did not intend to, and, in fact, did not, create a trust relationship with Prime when it executed the Agreements.

79.    The Parties' operative Agreements make clear that the relationship between Prime and Pine Grove was, at all relevant times, strictly a debtor-creditor relationship

## IV.    Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name

80.    The fiat that Pine Grove and other customers transferred to Prime was not segregated into separate bank accounts.  *See* <u>Ex. E</u>, Brennan Decl., ¶¶ 17.  Instead, the fiat was held in omnibus bank accounts in Prime's name containing fiat other customers transferred to Prime and fiat that Prime generated from its own business operations.  *See id*.

81.    Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("<u>BMO</u>"), Cross River Bank ("<u>CRB</u>"), Signature Bank ("<u>Signature</u>"), and Lexicon Bank ("<u>Lexicon</u>").  *See id.* at ¶ 16.

82.    All of the fiat transfers between Prime and Pine Grove during the Preference Period were transferred from an account held at BMO.  *See* <u>Ex. E</u>, Brennan Decl., ¶ 32.  *See also* Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "<u>BMO Agreement</u>").[12]

---

[12]    A copy of the BMO Agreement is attached as <u>Exhibit F</u>.

83.     The BMO Agreement specifically provides that the BMO Agreement "*is not for the benefit of any other person and no other person shall have any rights against [Prime] or [BMO Harris] hereunder.*"  See Ex. F, BMO Agreement, § 15(e) (emphasis added).

84.     The BMO Agreement does not state that the fiat was held "in trust for" or "for the benefit of" any party other than Prime.  *See* Ex. F, BMO Agreement.

85.     Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided." *See* Ex. G, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A (the "BMO Certification").[13]

86.     Prime regularly transferred fiat between its various bank accounts, further commingling funds.  *See* Ex. E, Brennan Decl., ¶ 50.

87.     For example, Prime used BMO x3077 primarily to make wire transfers.  *See id.* at ¶ 22.

88.     BMO x3077 held commingled funds that it regularly received from other Prime bank accounts and from Prime customers.  *See id.* at ¶ 23.

89.     At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[14]  *See id.* at ¶¶ 24-25.

---

[13]   A copy of the BMO Certification is attached as Exhibit G.

[14]   BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion."  *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit H, § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements).  *See* Ex. G, BMO Certification.

90.     The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id.* at ¶ 26.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds.  *See id.* at ¶ 28.

91.     In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature. *See id.* at ¶¶ 26-28.

92.     Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and Automated Clearing House transfer requests. *See id.* at ¶ 19.

93.     Prime typically made transfers between its bank accounts in round numbers, without reference to any specific transactions.  *See id.* at ¶ 30.  This suggests that Prime likely estimated the amount of funds to transfer instead of transferring specific funds in response to specific transaction activity.  *Id.*

94.     Prime would also transfer funds between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers.  *See id.* at ¶ 20.

95.     Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger.  *Id.* at ¶ 18.

96.     Prime bank statements reflect the movement of these funds between the Prime bank accounts but do not include details sufficient to identify where those funds originally came from, whom they were being transferred to, or for what reason they were being transferred. *Id.* at ¶ 29.

97.  ██████████ ("████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

> Q:  And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?
>
> A:  I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████ Dep."), 89: 19–25.

98.  Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  *See* <u>Ex. E</u>, Brennan Decl., ¶¶ 88–99. This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.  *Id* at 99.

99.  Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual.  *See id.* at ¶ 88.

100.  Former Prime employees testified that Prime commingled fiat transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

101.  ████ testified that "[r]econciliations were not being done in a timely manner." ████ Dep., 38: 23–24.

102.  ██████████ ("████"), Prime's former Chief Financial Officer, testified:

> Q:  Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?
>
> A:  I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ███████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

103.    ██████ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.*, 213:15–22.

104.    ████████ ("███"), Prime's former Senior Vice President of Operations and Reconciliations, also testified about Prime's reconciliations processes both before and after March 2021:

> Q:    When you say it was a problem, what do you mean?
>
> A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

██ Dep., 19:23–20:5.

105.    ██████ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

## 2   Finding and Response Summary Matrix

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|------|-----------|---------|--------|----------|-----------|----------|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

106.    Thus, Prime's repeated transfers of funds between omnibus bank accounts and Prime's failure to maintain proper tracking and reconciliation processes further exacerbated the commingling of fiat transferred to Prime by Pine Grove with fiat transferred to Prime by Prime's other customers and fiat generated from Prime's own business operations.  *See* Ex. E, Brennan Decl., ¶¶ 20–30.

## V.    Prime Commingled Crypto in Omnibus Wallets in Vaults

107.    As was the case with Prime's commingling of fiat, Prime did not maintain separate or segregated digital wallets for crypto.  ¶ *Id.* at 45.  Instead, Prime had Omnibus Wallets that commingled crypto transferred to Prime from different customers with Prime's own crypto that it used for corporate operations and purposes.  *See id.*

108.     Prime maintained its Omnibus Wallets in Prime's vaults ("Vaults") at Fireblocks LLC ("Fireblocks"), a third-party crypto security platform. *See id.* at ¶ 46.  Prime used Vaults within the Fireblocks' infrastructure to: (1) organize wallets (including the Omnibus Wallets), (2) enhance security measures, and (3) leverage efficient transaction policies and access controls. *See id*. Vaults are Fireblocks were not separated or segregated by digital wallets.  *See id*.

109.     Customers were each assigned unique deposit digital wallet addresses (the "Deposit Addresses") for sending crypto to Prime.  *See id.* at 47.  From time to time, Prime would conduct "sweeps" of those different Deposit Addresses to transfer crypto from those Deposit Addresses into one or more of the shared Omnibus Wallets controlled by Prime.  *See id*.  This process commingled crypto transferred to Prime by different customers together in the Omnibus Wallets. *See id*.

110.     Prime's internal process for performing sweeps was inconsistent and void of procedural safeguards.  *See id.* at ¶ 49-50.  Prime's application could trigger a sweep based on certain unknown events occurring or an employee could manually perform a sweep at any given time. *See id*. at 49.

111.     Prime also regularly transferred crypto between its multiple Omnibus Wallets, only further commingling the already commingled crypto contained in the Omnibus Wallets.  *See id.* at ¶ 50.

112.     In an attempt to track its crypto balances on behalf of its customers, Prime recorded its customers' transfers of crypto to Prime and its customers' withdrawals on its Internal Ledger. *See id.* at ¶51.  When a customer transferred crypto to Prime, Prime would credit that amount on its Internal Ledger.  *See id*.  The Internal Ledger, however, did not track to which Omnibus

Wallet(s) any specific crypto was transferred into when Prime swept Deposit Address(es).  *See id.* at ¶ 52

113.    When a customer requested to withdraw crypto, Prime would first verify the crypto balance that the customer supposedly had from the Internal Ledger to determine whether the customer had previously transferred sufficient crypto to Prime to support the withdrawal amount. *See id.* at ¶ 55.  If the customer had transferred sufficient crypto, Prime would then check its multiple Omnibus Wallets to determine from which Omnibus Wallet(s) if could withdraw the requisite amount of crypto to the customer.  *See id.*  In completing a transfer request, Prime did not transfer the same crypto that a customer had initially transferred to Prime via its respective Deposit Address because Prime's Omnibus Wallets did not segregate crypto by customer and, thus, could not be used to identify any original crypto transferred to Prime by a specific customer. *See id.*

### A.    Prime Commingled Crypto Transferred by Customer and Corporate Crypto

114.    To demonstrate the extent of Prime's commingling of crypto, the Brennan declaration discusses and illustrates several examples of commingling taken from transaction, blockchain, and other data.  *See id.* at ¶¶ 57-83.

115.    For example, Prime frequently swept crypto from the Deposit Addresses into one of Prime's Omnibus Wallets ending in ~b2ea (the "~b2ea Wallet").  *See id.*

116.    The Brennan Declaration provides an example of how three separate Prime customers sent crypto to their respective, unique Deposit Addresses which Prime subsequently swept into the ~b2ea Wallet:



*See id.* at ¶ 59.

117.    Just this one example illustrates how Prime commingled crypto transferred to it from three different customers into a single Omnibus Wallet.  This type of transaction occurred multiple times with the ~b2ea Wallet and with other Omnibus Wallets. *See id.*

118.    The Brennan Declaration also discusses how the crypto that customers transferred to Prime became further commingled with crypto that Prime used for its own corporate operations. Again using the ~b2ea Wallet as an example, Brennan describes how the ~b2ea Wallet received crypto from a Prime wallet that itself was funded from thousands of different wallets holding Prime's own crypto.  *See id.* at ¶ 63. This resulted in Prime's crypto, which was used for its own corporate operations, becoming commingled with crypto that customers had transferred to Deposit Addresses which Prime had already previously swept and commingled into this Omnibus Wallet. *See id.* at ¶¶ 61-63.

119.    Prime's commingling of crypto was further compounded by Prime's movement of commingled crypto between multiple Omnibus Wallets. Again, using the ~b2ea Wallet as an

example, the Brennan declaration discusses and illustrates how Prime transferred already commingled crypto between multiple Omnibus Wallets:



*See id.* at ¶¶65-66.

120.    The Brennan Declaration also discusses and illustrates how Prime's commingling of crypto in Omnibus Wallets make it practically impossible to determine if the crypto transferred from Prime to a customer to satisfy a withdrawal request included any of the original crypto that specific customer had originally transferred to Prime.  *See id.* at ¶ 67.

121.    The below illustration shows that while the ~b2ea Wallet received crypto swept from the Deposit Address of one of Prime's customers and from Prime's "PT Segregated Assets" digital wallet addresses that held corporate crypto (the "PT Segregated Assets Wallet"), Prime transferred crypto out of this ~b2ea Wallet to satisfy withdrawal requests from two completely different Prime customers.  *See id.* at ¶¶ 62-63.  Thees outgoing crypto transfers may have included

some or none of the crypto originally transferred to Prime by this Customer or from Prime's other customers.  *See id.* at ¶ 64.



*Id.*

### B.    Prime Pooled Crypto Together to Reduce Transaction Fees

122.    Prime generally swept crypto from the Deposit Addresses into shared Omnibus Wallets to pool crypto together for a number of reasons.  *See id.* at ¶¶ 69-83.

123.    One primary reason for pooling crypto together was that Prime and its customers could bypass and save on various transaction fees[15] that would otherwise be incurred by conducting transactions on the blockchain.  *See id.* at ¶¶ 69-72.  Specifically, for crypto transfers within a single Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger rather than conduct any transactions on the blockchain which would otherwise incur transaction fees.  *See id.* at ¶¶ 71-73.  When Prime did conduct on-chain transactions, it reduced transaction fees by pooling transactions and performing them during off-peak hours when the blockchain network was less congested.  *See id.* at ¶¶ 69-83.

---

[15]    "Transactions occurring on the blockchain incur fees. One the Ethereum blockchain, these are referred to as 'gas fees.' Gas fees refer to costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain. In other words, they are fees charged by the blockchain itself for successfully completing a transaction. However, on the Bitcoin blockchain, these are referred to simply as 'transaction fees.' Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block." In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain. *Id.* at ¶¶ 40-41. We use "transaction fees" to refer to both "gas fees" and BTC transaction fees herein but only use the term "gas fees" to refer to transaction fees incurred on the Ethereum network.

124.    By sweeping BTC together that had been transferred to Prime by multiple customers, Prime's commingling of BTC make distinguishing the original digital wallet from which the BTC originated from nearly impossible.  *See id.* at 83.

125.    To help account for the gas fees Prime incurred for transacting on the Ethereum blockchain, Prime set up additional digital wallets it referred to collectively as the "Gas Stations." *See id.* at ¶ 73.  Prime funded the Gas Stations from its various other wallets (including the Omnibus Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.  *See id.*  Prime used a variety of sources to fund gas stations, which resulted in Prime further commingling crypto transferred to Prime by customers with Prime's own crypto.  *See id.* at 80.

126.    As demonstrated below, funding sources for the Gas Stations (represented by bright green nodes) included Prime's Omnibus Wallets (represented by green nodes at the top), customers' external digital wallets (represented by the pink,  blue, red and yellow nodes) and several external digital wallets that appear to be unattributable to Prime or its customers (represented by gray notes):



*See id.* at ¶ 76.

127.    Therefore, the Gas stations were funded by Prime's corporate fiat, crypto from commingled Omnibus Wallets (including the ~b2ea Wallet described above), and crypto from external wallet addresses.  *See id.* at ¶ 108.

128.    Prime also swept Tether stablecoin ("USDT") transactions from various Deposit Addresses into one of Prime's Omnibus Wallets to reduce gas fees on the Ethereum blockchain, which meant that a Prime customer receiving USDT from Prime not only received commingled USDT but also received commingled ETH to pay for the transaction fees from Prime's Gas Stations.  *See id.* ¶ 84.

129.    By sweeping and pooling crypto together, Prime was able to reduce transaction fees but commingled crypto transferred to Prime by customers with Prime's corporate crypto in several different ways throughout the process.  *See id.* at ¶¶ 57-83.

### C.    Prime Did Not Reconcile Crypto Transactions

130.    Similar to Prime's handling of fiat, Prime did not conduct regular, timely, or accurate reconciliations to compare the crypto recorded in its Internal Ledger with the crypto that Prime actually held in its Omnibus Wallets.  *Id.* at ¶¶ 88-118.

131.    All crypto of value held by Prime is in Prime's Vaults with Fireblocks, and none of that crypto has clear ownership provenance.  *See id.* at ¶¶ 88-118, 142.

132.    Prime's own internal data presents conflicting information regarding how certain digital wallets were attributed to different entities as well as falsified entries in Prime's Internal Ledger.  *See id.* at ¶¶ 100-118.

133.    Because of commingling and poor reconciliations' processes described above and confirmed in the Brennan Declaration, it is impossible to specifically identify, trace, or segregate

crypto that specific customers transferred to Prime from crypto provided by other customers or crypto generated from Prime's business operations. *See id.* at ¶¶ 67, 87.

## VI.   The 98f Wallet

134.   In December 2021, Plutus Financial Inc. d/b/a Abra ("Abra"), one of Prime's largest customers, requested a transfer of 5,867.71 ETH (worth approximately $24,000,000.00 USD at the time) from Prime. *See id.* at ¶ 100.  Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000.00 at the time). *See id.* at ¶ 105.

135.   In attempting to satisfy Abra's transfer request, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:



136.   Further investigation revealed that, for approximately eight months, Abra had been transferring significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—*i.e.*, the 98f Wallet.

137.   Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (approximately $45,000,000.00 at the time) to the 98f Wallet. *See* Ex. E, Brennan Decl., ¶ 102.

138.   Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet. *See id.* at ¶ 101.

139.    It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  *See* ███ Dep., 69:17–71:22.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See* ███ Dep., 181:6–8.  Prime also did not possess and could not locate the passwords, which are called "seed phrases," that were associated with these physical hardware devices.  *See id*.

140.    As such, Prime had no way of accessing the 98f Wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

141.    Prime was concerned about the negative impacts and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

142.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests as reflected below.

143.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider to attempt to satisfy Abra's withdrawal requests as reflected in the chart below.  *See* Ex. E, Brennan Decl., ¶ 105.

| Date | USD Internal Ledger "Wire" Transfer[16] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250 |
| 1/6/2022 | $2,778,400 | 800 |
| 1/6/2022 | $7,293,300 | 2,100 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800 |
| 3/15/2022 | $8,524,750 | 3,049.98 |

---

[16]    Prime did not actually execute any of these wire transfers. *See* ███ Dep, 164:22–165:10.

| 3/15/2022 | $8,043,000 | 3,000 |
|---|---|---|
| 3/29/2022 | $7,902,800 | 2,300 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

144.     The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers.  *See id.* at ¶ 106.

145.     The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, █████████:

> Q:     So [Customer's] depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:     I would defer to █████ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:     What's use of omnibus funds?
>
> A:     As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:     And which funds were used to make the purchases of the ETH to fund the transactions?
>
> A:     Funds from the fiat account.  Fiat omnibus account.  Is my understanding. Once again, █████ would know specifically.

Deposition of █████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

146.     The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.  *See* <u>Ex. E</u>, Brennan Decl., ¶ 108.  Thus, it is "indisputable" that

the ETH that Prime transferred to Abra to satisfy its withdrawal requests could not be the same ETH that Abra had originally transferred to Prime. *See id.*

**VII.   Prime Ultimately Corrupted and Falsified its Ledger to Hide Its Actions with Respect to the 98f Wallet**

147.   Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Abra's withdrawal requests related to the 98f Wallet. *See id.* at ¶ 118.

148.   Prime executives discussed how to hide these transactions from auditors at Nevada FID:



149.   ███ confirmed in his deposition that Prime executives intentionally chose to settle and record the purchases of ETH from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to Liquidity Provider. *See* ███ Dep., 153:8–13.

150.   Specifically, Prime settled its ETH purchases from Liquidity Provider by "credit[ing]" Liquidity Provider's customer balance at Prime with fiat amounts equivalent to each ETH purchase. *See id.* at 204:16–21.  To "credit" Liquidity Provider's fiat balance with Prime, Prime had to input a "contribution" on its Ledger to make it appear as if Liquidity Provider had wired fiat to Prime. *See id.* at 155:11–156:9.  In reality, no funds were moving from one account to another in connection with the ETH purchases.

151.   ███ testified:

A:   So let me—let me make sure I understand what you said.  You said how to get money to [Customer].  You meant how to get money to [Liquidity Provider]; right?

A:   Sorry, yeah, that's what I meant.  [Liquidity Provider].

Q:   Okay.  So in order to credit [Liquidity Provider]'s cash account at Prime, there needed to be a contribution on the internal [l]edger; is that right?

A:   Correct.

Q:   And once there is a contribution to the internal [l]edger, then when [Liquidity Provider] goes to its account, it looks like there is more cash in the account; isn't that right?

A:   Correct.

Q:   There's not actually any more cash in the bank account; right?

A:   No, there is no—there is no credit of that money to the bank accounts, only to the [l]edger.

*Id.*

152.     These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its bank accounts. *See id.*

> ███@primetrust.com                                    2021-12-23 03:40:01.000 AM
> If we don't credit our ledger to settle, our bank account is plus the difference compared to the bank
>
> ███@primetrust.com                                    2021-12-23 03:42:16.000 AM
> The difference is are we okay with inflating our ledger vs having our bank account be out the difference compared to our ledger
>
> ███@primetrust.com                                    2021-12-23 03:44:15.000 AM
> Whatever you think is easier to reconcile once we get access to the locked ETH

153.     ███ further testified about Prime's "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

Q:     [T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?

A:     Correct.  Correct.

Q:     And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:     Correct . . .

Q:     I see.  But the [l]edger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:     Exactly.

Q:     That's ultimately what happened; right?

A:     Yeah, that's exactly what happened.

███ Dep., 144:11–20; 146:7–15.

-37-

154.    ▮▮▮ explained that Prime chose to record its purchases of ETH from Liquidity Provider to satisfy the transfer requests of Abra on Prime's Ledger because that approach made it easier for Prime to avoid detection from Nevada FID:

Q:    And FID is Nevada Financial Institution Division; right?

A:    I think so.  Yeah.

Q:    And so, what is ▮▮▮ talking about when he's saying "minimizing FID scrutiny during audit time"?

A:    It wasn't a—I think what he's saying is, you know, when FID comes to do their regular—regulatory reviews with us, you know, how do—how do they get around—or not get around, but how do they minimize, you know, the scrutiny that FID would come down on Prime Trust for doing this.

Q:    So ▮▮▮'s saying, it sounds like, it would be easier to hide it from FID if we do it internally as opposed to externally; is that right?

A:    That's—that's what he was trying to do, yeah.

▮▮▮ Dep. 152:18–153:13.

155.    Prime executives seem to have undertaken efforts to make Internal Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.  *See* Ex. E, Brennan Decl., ¶ 109.

156.    As demonstrated by the illustrative chart below,[17] Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

---

[17]    This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ████████████████0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ████████████████0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ████████████████b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ████████████████5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ████████████████6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ████████████████777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ████████████████c2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ████████████████1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ████████████████113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ████████████████ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

157.    Prime's bank account statements do not reflect any of these wire transfers because they did not actually occur.[18]  *See id.* at ¶ 115.

158.    Prime's Internal Ledger shows incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000.00 on December 23, 2021, and $12,158,250.00 on December 31, 2021.  *See id.* at ¶ 16.

159.    These transfers correspond exactly with the value of the first two ETH purchases that occurred on these two days.  *Id.*

160.    However, these incoming wire transfers are not recorded in Prime's bank account statement for December 2021. I*d*.

161.    The reason for this is simple: these incoming wire transfers never occurred and instead were manufactured by Prime to conceal its use of customer-transferred, commingled fiat to fund the purchases of ETH from Liquidity Provider to satisfy Abra's transfer requests.

---

[18]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as <u>Exhibit I</u>.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as <u>Exhibit J</u>.

162.      These false accounting entries were confirmed by ███ , who also recognized that Prime's bank account statements would not reflect incoming wire transfers shown on Prime's Internal Ledger:

> Q:      When it says funds transfer in column F and it says "wire, wire, wire."  Do you see that?
>
> A:      Yes.
>
> Q:      There were no wire transfers; right?
>
> A:      Yes.
>
> Q:      Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?
>
> A:      Yes, there were no wire transfers.
>
> . . .
>
> Q:      And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?
>
> A:      Correct.
>
> Q:      And that's because there were no wire transfers out to [Liquidity Provider] in connection with these transactions; right?
>
> A:      No wire transfers in.

███ Dep., 164:22–165:10; 166:5–15.

163.      Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH. The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations. *See* Ex. E, Brennan Decl., ¶ 143.

**VIII.    Pine Grove Cannot Trace the Fiat and Crypto It Transferred to Prime**

164.    Prime held fiat and crypto transferred to it from customers in an omnibus, commingled manner. *See id.* at ¶¶ 15–31.  This approach resulted in Prime's own employees being incapable of determining where any fiat transferred by a particular customer was located, as ████ testified:

Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:    And what does that mean to you, a client to have an omnibus account?

A:    It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:    And that was done at Prime Trust?

A:    It was done at Prime Trust.  It wasn't done very frequently, but there were—there were omnibus accounts at Prime Trust.

Q:    And do you know who was responsible for those accounts?

A:    I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

████ Dep., 205:19–207:3.

165.    Another example of the confusion in tracing specific assets that customers transferred to Prime is demonstrated in the below internal Prime correspondence from

-41-

December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



166.    ███ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

> On Mon, Dec 19, 2022 at 9:28 AM ███████        @primetrust.com> wrote:
>
> Hey ███,
> Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

167.    ███████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat and crypto and that Prime was "*not able to specify what customer is out the funds due to our omnibus structure*":

> On Wed, Dec 28, 2022 at 10:56 AM ███████        @primetrust.com> wrote:
>
> ██████ and I met today.  We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure.  Please let us know if we need to have another conversation to align how to position this with the FID.

168.    Because of Prime's commingling of fiat and poor recordkeeping procedures, it is impossible for PCT, Pine Grove, or anyone else to trace and specifically identify the fiat that Pine Grove originally had transferred to Prime.  *See* Ex. E, Brennan Decl., ¶¶ 67.

## IX.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

169.    Prime ultimately reported the 98f Wallet issues to Nevada FID between September and November 2022.

170.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

171.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

172.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

173.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

174.    The next day, BitGo canceled its acquisition of Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns

over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

175.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court"). *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prim e%20Core%20Technologies%20et%20al%20Petition.pdf.   The Nevada FID Petition directed Prime to cease and desist all retail trust activities. *Id.*

176.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

177.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***." *Id.* at 6 (emphasis added).

178.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

179.    On July 14, 2023, the Nevada Court placed Prime under receivership.

180.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

**X.    Transfers From Prime to Pine Grove During the Preference Period Are Avoidable**

181.    Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

182.    First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

183.    Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

184.    Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

185.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(4).

186.    Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made. 11 U.S.C. § 547(b)(5)(A)–(C).

187.    Prime transferred $2,520,831.01 USD from Prime's BMO x3077 account to or for the benefit of Pine Grove during the Preference Period. *See id*. at ¶ 122.

188.    As previously alleged, the fiat in Prime's BMO x3077 account commingled fiat transferred to Prime by multiple Prime customers, including Pine Grove.

189.    During the Preference Period, Pine Grove's fiat transactions differed markedly from fiat transactions prior to the Preference Period. In the period prior to the Preference Period,

from February 14, 2023 to May 15, 2023, the average number of fiat transactions per month was 559. *Id* at ¶ 121.  In stark contrast, during the Preference Period, the average number of fiat transactions per month between Prime and Pine Grove was one.  *Id.*

190.    The average transaction before the Preference Period was $259,451.46 for incoming transfers and $27,513.91 for outgoing transfers, whereas during the Preference Period there were no incoming transfers and there was one outgoing transfer of $2,520,831.01, a 9,602% increase compared to the period prior to the Preference Period. *Id.*

191.    The BMO x3077 bank statement reflects the one outgoing wire transfer from Prime to Pine Grove totaling $2,520,831.01 on May 31, 2023:



*Id.* at ¶ 132.

192.    As demonstrated by the above excerpts of the BMO x3077 bank statements, the BMO bank statements do not identify the sender or recipient of specific transfers. However, extracts of bank data from the BMO bank reconciliation data, entries in the Internal Ledger, and API log audit provide details sufficient to piece together this information.  *Id*. at ¶ 133.

193.    The transaction data, coupled with Prime's gross failures in fiat segregation, reconciliation, and Prime's inability to distinguish fiat or crypto transferred to Prime by certain customers from crypto transferred to Prime by other customers or company fiat, make it clear that neither Pine Grove nor Prime can specifically identify or segregate: (i) the specific fact that Pine Grove transferred to Prime from other commingled fiat held by Prime; or (ii) the original source of the fiat that Prime transferred to Pine Grove during the Preference Period. *Id.* at ¶ 136.

194.    This differed markedly from transactions prior to the Preference Period. From February 14, 2023 through May 23, 2023, there was no crypto transaction activity.  However, during the Preference Period, Pine Grove made two withdrawals in just one day. *Id.* at ¶ 137.

195.    All Crypto Transfers to Pine Grove during the Preference Period came from Prime Omnibus Wallets that contained commingled crypto. *Id*. at ¶ 141.

196.    Pine Grove did not make transfers of potential subsequent new value following the Crypto or Fiat transfers. *Id.* at ¶¶ 125, 140.

197.    The Transfers were made while Prime was insolvent.  As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[19]  If not avoided, the Transfers will enable Pine Grove to receive more than Pine grove would have received on account of its claim in a hypothetical liquidation under chapter 7 had

---

[19]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

Prime not made the Transfers in satisfaction of Prime's antecedent debt to Pine Grove. *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

198.     During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to Pine Grove during the Preference Period.  It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property and to or for the benefit of Pine Grove or any other transferee.  PCT reserves its right to amend this original Complaint to include:  (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revision to Pine Grove's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfers,
### 11 U.S.C. § 547(b)

199.     PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

200.     Each of the Transfers was a transfer of an interest in property of Prime.

201.     Prime made the Transfers to or for the benefit of Pine Grove.

202.     At the time of the Transfers, Pine Grove was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code. Pine Grove received the Transfers, or, alternatively, the Transfers were made for Pine Grove's benefit.

203.     Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

204.    Each of the Transfers was made within ninety days of the Petition Date

205.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.  If not avoided, the Transfers would enable Pine Grove to receive more than Pine Grove would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

206.    Pine Grove has not repaid or returned any of the Transfers to PCT.

207.    Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Pine Grove could assert, including Pine Grove's potential defenses under section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

208.    Accordingly, PCT is entitled to recover from Pine Grove not less than $2,520,831.01, 19.13 BSC, and 120 USDC as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

### Count II
### Recovery of Avoided Transfers from the Defendant,
### 11 U.S.C. § 550

209.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

210.    PCT is entitled to avoid preferential transfers described above pursuant to section547(b) of the Bankruptcy Code.  Pine Grove was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

211.    Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Pine Grove: not less than $2,520,831.01, 19.13 BSC, and 120 USDC of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

<u>**Count III**</u>
**Claim Objection, 11 U.S.C. § 502**

212.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

213.    As alleged above, Pine Grove was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the persons for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to Section 547(b) of the Bankruptcy Code, which are recoverable from Pine Grove under Section 550 of the Bankruptcy Code.

214.    Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Pine Grove that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Pine Grove pays PCT the value of the Transfers, for which and to the extent that the Court has determined Pine Grove is liable pursuant to 11 U.S.C. § 550.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.    Enter an order finding that the transfers from Prime to or for the benefit of Pine Grove addressed herein are avoidable preferential transfers under 11 U.S.C. § 547;

B.    Award PCT: (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting

the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to Pine Grove;

C.     Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Pine Grove against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Pine Grove relinquishes to PCT the amount ordered as an award for avoidable transfers;

D.     Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.     Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated:  July 2, 2025
        Wilmington, Delaware

MCDERMOTT WILL & EMERY LLP

/s/ David R. Hurst
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:      dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:      dazman@mwe.com

jbevans@mwe.com
jpardo@mwe.com
ggriffith@mwe.com
pkennedy@mwe.com
jaminov@mwe.com
mduque@mwe.com

*Counsel to PCT Litigation Trust*